## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| LIBERTY MUTUAL<br><br>Plaintiff<br><br>v.<br><br>MICHAEL ANGELO,<br>ORTHOPEDIC, P.C.,<br>MUHAMMAD S. AWAISI, M.D.,<br>SAM HAKKI, M.D.,<br>REESE J. JAMES, D.O.,<br>CHITRA SINHA, M.D.,<br>MERCYLAND HEALTH SERVICES,<br>P.L.L.C.,<br>US HEALTH PHARMACEUTICALS D/B/A<br>MEDS DIRECT, GREATER LAKES<br>AMBULATORY SURGICAL CENTER and<br>TOX TESTING INC.,<br><br>Defendants | Case No. 2:19-cv-12051<br> DEMAND FOR JURY TRIAL |

## <u>COMPLAINT</u>

Liberty Mutual Automobile Insurance Company ("Liberty Mutual"), for its

complaint against defendants Michael Angelo ("Angelo"), Orthopedic P.C.

("Orthopedic P.C."), Muhammad S. Awaisi, M.D. ("Awaisi"), Sam Hakki, M.D.

("Hakki"), Reese J. James, D.O. ("James"), Chitra Sinha, M.D. ("Sinha"), Mercyland

Health Services, P.L.L.C. ("Mercyland"), US Health Pharmaceuticals d/b/a Meds

1

Direct ("Meds Direct") Greater Lakes Ambulatory Surgical Center ("GLASC") and Tox Testing Inc. ("Tox Testing"), (collectively "Defendants"), alleges as follows:

## I.   **BACKGROUND**

1.     This suit involves Defendants' pattern and practice to deceive and fraudulently obtain money from Liberty Mutual by submitting, or causing to be submitted, bills and supporting documentation for services purportedly rendered to individuals ("patients") who have been in automobile accidents.  Said bills have been submitted for payment pursuant to the Michigan No-Fault Act, MCLA 500.3101, *et seq.*, which Defendants utilize to leverage payments at a higher recovery rate than would be received under Medicare or other health insurance rates.

2.     These patients are eligible for personal injury protection benefits ("No-Fault Benefits") under Liberty Mutual policies, however, the services in issue are either not performed, performed outside an acceptable standard of care or are performed regardless of medical necessity.

3.     In fact, if performed at all, the subject services are performed pursuant to a predetermined protocol approach, rather than a dynamic one, that solely enriches the Defendants and ignores any potential care an individual may or may not need.

4.     Each Defendant in this suit is intricately linked, however Defendant Angelo is the primary driver of this dispute.  As such, Defendant Angelo relies upon the remaining Defendants to play certain roles to defraud the Plaintiff.

5.     In or around 2008, Defendant Angelo purchased Greater Lakes Ambulatory Surgical Center, L.L.C. ("GLASC"), an ambulatory surgical center located in Clinton Township, Michigan.

6.     Likewise, Angelo formed a pharmacy, Meds Direct, and a toxicology company, Tox Testing, both of which operate inside GLASC.

7.     As alleged in this Complaint, Defendant Angelo controls various medical practices that share commercial space at GLASC as part of financial arrangements.

8.     Said agreement provides patients to certain practices in exchange for the providers referring patients to practices which he owns for services that are medically unnecessary and operated outside a scope of acceptable medical practice.

9.     Defendant Angelo's present scheme began in 2015, by which point Angelo arranged for Orthopedic P.C., and, later, its successor, Mercyland, to operate from an office suite located at GLASC and recruited Defendants Awaisi, Hakki, James, Sinha, and other physicians who worked at Orthopedic P.C. and/or Mercyland ("the Physicians") to participate in the fraud scheme.

10.    At Bar, the Physicians purport to perform an examination and diagnose patients supplied by Defendant Angelo.

11.    Despite this process, same is a pretext to administer a predetermined treatment protocol through which the Physicians will prescribe medically unnecessary opioids and refer patients for medically unnecessary urinary drug testing.  All of this benefits Defendant Angelo as he owns the practices in question.

12.    There are other procedures and services also in issue including but not limited to P-STIM or the placement of a microchip- controlled pulsed neurotransmitter. These services were purportedly performed and placed in a surgical setting by and from Defendants Awaisi, Orthopedic PC and GLASC.

13.    These devices, however, are simply placed in the pre/post operative area in GLASC, some even in examination rooms, yet Liberty Mutual was charged for inflated fees misrepresenting the alleged "surgical implantation."   Moreover, the CPTs used intentionally misrepresented the specific device used to further inflate charges reimbursable by Liberty Mutual.

14.    As the before-mentioned services were either not rendered or rendered in a protocol and non-dynamic approach, the Defendants have been unjustly enriched and fraudulently submitted billing for services that were not due and owed.

15.     This suit, therefore, seeks a Declaratory Judgment that Liberty Mutual is not liable for any pending bills or bills that Defendants have submitted, in the past and through the trial of this case based upon the above-described conduct.

16.     Liberty Mutual has not been reimbursed by the Michigan Assigned Claims Facility, the Michigan Catastrophic Claims Association, or any other source for any of the charges at issue in this case.

## II.    JURISDICTION AND VENUE

17.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 *et seq.* because they arise under the laws of the United States.

18.     Pursuant to 28 U.S.C. § 1332(a)(1), this Court independently has jurisdiction over all claims because the matters in controversy exceed the sum or value of $75,000, exclusive of interest and costs, and are between citizens of different states.

19.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district because this is the jurisdiction where Defendants reside, and a substantial part of the events or omissions that gave rise to the claims occurred here.

## III.  PARTIES

20.     Plaintiff, Liberty Mutual is a citizen of Massachusetts. It is a corporation organized under the laws of Massachusetts, with its principal place of

business in Boston, Massachusetts. At all relevant times, it was licensed in Michigan to engage in the business of insurance.

21.    Defendant, Greater Lakes Ambulatory Surgical Center, LLC, is a corporation, duly organized and existing under the laws of the State of Michigan and at all times pertinent herein was conducting business at 16100 19 Mile Road, Suite 300, in Clinton Township, Michigan.

22.    Defendant, Muhammad S. Awaisi, M.D.is the resident agent of Orthopedic P.C. with its principal place of business located at 16100 19 Mile Rd., Clinton Township, Michigan 48038, which is the office suite at GLASC.

23.    Defendant Awaisi incorporated Orthopedic P.C. as a Michigan professional corporation. It is a citizen of Michigan.

24.    On October 25, 2016, Mohammed Ali Abraham incorporated Defendant Mercyland Health Services, P.L.L.C. as a Michigan professional limited liability corporation with its principal place of business at 16100 19 Mile Rd., Clinton Township, Michigan 48038.

25.    Because Mohammed Ali Abraham is a resident and citizen of Michigan, Defendant Mercyland is a citizen of Michigan.

26.    Defendant Meds Direct is a Nevada corporation that was incorporated using the name "US Health Pharmaceuticals." On May 1, 2014, it filed its Application for Certificate of Authority to Transact Business or Conduct Affairs In

Michigan. Its principal place of business is at 16100 19 Mile Rd., Clinton Township, Michigan 48038. Thus, it is a citizen of both Nevada and Michigan.

27.      Defendant Tox Testing Inc. is a Delaware corporation. On August 23, 2015, it filed its Application for Certificate of Authority to Transact Business or Conduct Affairs In Michigan. Its principal place of business is at 16100 19 Mile Rd., Clinton Township, Michigan 48038. Thus, it is a citizen of both Delaware and Michigan.

28.      Defendant Michael Angelo is the owner of GLASC, Orthopedic PC and Mercyland and owns the building at 16100 19 Mile Rd., Clinton Township, Michigan.

29.      Defendant Sam Hakki, M.D. is a resident and citizen of the state of Michigan and has been a licensed physician in Michigan since 2013.

30.      Defendant Reese James, D.O. is a resident and citizen of the state of Michigan.  Although James is a licensed physician in Michigan, his license was suspended from February 2017 until February 2018.

31.      Defendant Chitra Sinha, M.D. is a resident and citizen of the state of Michigan and has been a licensed physician in Michigan since 2011.

## IV.  ALLEGATIONS AS TO ALL COUNTS

**A.      The Defendants have Breached their Duty of Care by their Actions.**

32.    The Defendants, by and through their action and inaction have breached the duty of care as physicians.

33.    The Defendants have failed to provide a reasonable standard of care by repeatedly misrepresenting findings, ignoring test results, failing to make a proper diagnosis and bill for services that never took place.

34.    In some instances, the services provided, placed the patient in a worse or greater harm than that of where the patient was before they initially sought treatment.

35.    The overwhelming objective medical evidence in hand shows that the Defendants treatment of their patients was a protocol approach rather than a dynamic one to medicine that failed to take into account other treatment options, care paths or solutions.

36.    In fact, the statistical percentage of the patient referral network amongst these particular Defendants was almost 100% without deviation with no regard for injury, complaint or situational circumstance.

**B.    The Defendants Bills were not Reasonable Under the No-Fault Act.**

37.    Michigan requires automobile insurance companies to provide unlimited No-Fault Benefits if all conditions of eligibility are met.

38.    Specifically, insurers are required to pay No-Fault Benefits, including "allowable expenses consisting of all reasonable charges incurred for reasonably

necessary products, services and accommodations for an injured person's care, recovery or rehabilitation," when those benefits are causally connected to an "accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle." MCL §§ 500.3105, 3107(1)(a).

39.    The Defendants knew that the charges at issue in this Complaint were not for reasonably necessary products or medical services.

40.    Despite this fact, the Defendants engaged in a pattern and practice of billing Liberty Mutual for services that were not reimbursable, fraudulent and not rendered.

## C.    Liberty Mutual' s Justifiable Reliance

41.    Defendants submitted, and caused to be submitted, medical records and bills falsely representing that Orthopedic P.C., Mercyland, GLASC, Meds Direct, and Tox Testing provided services that were medically necessary when, in fact, they were not.

42.    Liberty Mutual is under statutory and contractual duties to promptly pay No-Fault Benefits for medically necessary services. The bills and supporting documents that Defendants submitted, and caused to be submitted, to Liberty Mutual in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause Liberty Mutual to justifiably rely on them.

43.     Defendants have made material misrepresentations and have taken other affirmative acts to conceal their fraud from Liberty Mutual. Each bill and its supporting documentation, when viewed in isolation, do not reveal their fraudulent nature. Only when the bills and supporting documentation are viewed together as a whole and over time, do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation.

44.     As a result, Liberty Mutual has incurred damages of more than $1,500,000.00 in No-Fault Benefits that it paid to Defendants.

## D.     The Improper Prescription of Opioids and Urinary Drug Testing

45.     When a patient seeks treatment for pain, a licensed professional must obtain a history and perform an examination to arrive at a legitimate diagnosis and, based on that diagnosis, must engage in medical decision-making operation to design a legitimate treatment plan that is tailored to the unique needs of each patient, i.e. a dynamic treatment of that patient.

46.     Depending on the individual patient's history, physical exam, and diagnosis, the prescription of opioids may be appropriate to alleviate pain.

47.     The Center for Disease Control has published Guidelines for Prescribing Opioids for Chronic Pain ("CDC Guidelines"). According to the CDC Guidelines, "opioids should not be considered first-line or routine therapy for chronic pain."

48.     Among other things, the CDC Guidelines instruct that before prescribing opioids, a physician must engage in a legitimate evaluation of the patients' unique circumstances, including the patient's history and symptoms, to determine whether opioid therapy is appropriate.

49.     The CDC Guidelines further instruct that "[b]efore starting and periodically during opioid therapy, clinicians should discuss with patients known risks and realistic benefits of opioid therapy and patient and clinician responsibilities for managing therapy."

50.     Additionally, according to the CDC Guidelines, "[w]hen opioids are started, clinicians should prescribe the lowest effective dosage."

51.     In 2003, the Michigan Board of Medicine and the Michigan Board of Osteopathic Medicine & Surgery adopted the "Michigan Guidelines for the Use of Controlled Substances for the Treatment of Pain."

52.     According to the Michigan Guidelines, providers should take steps to ensure that opioids are being appropriately prescribed.

53.     They further state that prior to prescribing opioids, a medical history and physical examination should be obtained and documented in the medical record, including the nature and intensity of pain, current and past treatments for pain, underlying or coexisting diseases or conditions, the effect of the pain on physical and psychological function, history of substance abuse, and the presence

of one or more recognized medical indications for the use of a controlled substance.

54.    Importantly, the Michigan Guidelines instruct physicians to keep complete, current, and accurate medical records that include the following:

- The medical history and physical examination

- Diagnostic, therapeutic and laboratory results

- Evaluations and consultations

- Treatment objectives

- Discussion of risks and benefits

- Treatments

- Medications (including date, type, dosage and quantity prescribed)

- Periodic reviews

55.    To help control opioid abuse, Urinary Drug Testing can provide information to a medical provider that is critical in assessing whether opioid drug prescriptions, or continued opioid prescriptions, are appropriate for a particular patient.

56.    In particular, the testing will show whether or not the prescribed narcotic is being taken by the patient and will also show if there are any illicit drugs also in the patient's system to better help the physician care for his or her patient.

57.    The Defendants herein failed to adhere to the CDC Guidelines or the Michigan Guidelines, ordering opioids and UDTs pursuant to the Predetermined Protocol without performing legitimate exams, or engaging in legitimate decision-making and without appropriately documenting or considering the need for the opioids or UDT results.

### E.    Defendants' Fraudulent Treatment of the Patients

58.    The Defendants have acted in concert to carry on their scheme, with each playing different roles that are essential to the success of the scheme. Specifically, Angelo has established, owned, or controlled GLASC, Tox Testing, Meds Direct, Orthopedic P.C., and Mercyland. To conceal his secret control over Orthopedic P.C., Angelo used Awaisi and Abraham as paper owners of Orthopedic P.C. and Mercyland, respectively, to provide the illusion that these clinics and the Physicians were independent medical practices and practitioners. The Physicians who have worked at Orthopedic P.C. and Mercyland have carried out the Predetermined Protocol by examining patients and, to exploit patients' No-Fault Benefits, ordering medically unnecessary opioids and UDTs.

### F.    Defendants' Fraudulent Initial Examinations

59.    The Predetermined Protocol begins with the initial examinations, which are typically followed by re-examinations performed by the Physicians periodically over the course of treatment. These examinations are not designed to

legitimately diagnose and arrive at a treatment plan that addresses any patient's unique needs, but are done as a pretext to facilitate the Predetermined Protocol that was developed before the patient's initial consultation at the medical office. Thus, the services rendered were fraudulent because they were not rendered in response to the unique presenting condition of each patient, but were rendered to conform to the Predetermined Protocol without regard to the condition of each patient.

60.    These examinations are not designed to legitimately diagnose and arrive at a treatment plan that addresses any patient's unique needs, but are done as a pretext to facilitate the Predetermined Protocol by referring the patients for other services or treatment, including opioids and UDTs, that are provided through entities owned or controlled by Angelo, without regard for whether they are needed or not.

61.    The patterns in the examinations and referrals, as well as the corresponding documentation generated by the Physicians, reveal no meaningful effort to determine whether opioid prescriptions are indicated or contraindicated, including a failure to consider or integrate the results of the UDTs into the patients' treatment plans.

62.    The charts attached hereto as Exhibits 1 and 2 set forth the claims in which Defendants submitted, and caused to be submitted, to Liberty Mutual bills

and supporting documentation that include fraudulent examinations, re-examinations, UDTs, and opioids purportedly performed on Orthopedic P.C. and Mercyland patients.

63.    Based upon the patterns in the examination reports, which are reflected in Exhibits 1 and 2, these examinations are not legitimate and are not intended to legitimately diagnose the patient's injuries, create an appropriate treatment plan, and/or tailor the plan to the patient's response to treatment (or lack thereof).

64.    Specifically, when the documentation for the examinations and re-examinations are viewed together, patterns in the documentation show a lack of fundamental and critical physical examination information: the providers typically fail to conduct any orthopedic tests, sensory nerve tests, motor nerve tests, reflex tests, or other baseline measures that should be performed to arrive at a legitimate differential diagnosis and treatment plan, much less determinations of the appropriateness of narcotics prescriptions over substantial periods of times and other procedures.

65.    Orthopedic tests, as well as sensory, motor and reflex testing, are important and basic components of physical examinations to arrive at a legitimate diagnosis and treatment plan. Furthermore, it is basic and important to document the results of these tests to establish baselines against which to measure a patient's progress or lack thereof over time and in response to various forms of treatment

66.     Yet, the Physicians fail to document any sensory nerve tests, motor nerve tests, reflex tests, or orthopedic tests in almost any of their examinations.

67.     For instance, the Physicians often document diagnoses of "cervical radiculopathy" or "lumbar radiculopathy," which would be caused by injuries to the sensory or motor nerve roots that are located at each level of the spine. Yet, as noted above, their examination reports fail to document any of the standard testing that should be performed as part of any legitimate examination to arrive at these diagnoses. Moreover, the documentation for some of these examinations does not reflect that the patient complained of any radicular symptoms.

68.     In addition, the Physicians routinely fail to provide specificity with regard to range of motion deficits patients may have in any area of the body, including any region of the spine, any joint or any limb, other than simply stating that range of motion was "decreased" in a region of the spine. This provides no baseline for which the Physicians can monitor patient progress or lack thereof over time and in response to various forms of treatment.

69.     In short, the Physicians make no attempt to legitimately examine patients, diagnose their injuries, reach a differential diagnosis, and determine an appropriate, individually tailored treatment plan.

70.     Instead, the patterns in the examinations reveal that, if the examinations were performed at all, the outcomes were predetermined to include a series of

treatments that are engineered to maximize the revenue Defendant Angelo is able to generate from Meds Direct and Tox Testing, namely: (a) prescriptions for pharmaceuticals, including opioids; and (b) referrals for UDTs.

### G.    Defendants' Fraudulent Opioid Prescriptions

71.    Until at least 2018, the Physicians at Defendants Orthopedic P.C. and Mercyland prescribe opioids to virtually all patients following the initial examination.

72.    Tellingly, the Physicians do not document *any* analysis of whether the patient is at a risk for addiction or overdose, including whether the patient has any current or historical substance abuse issues.

73.    Additionally, the Physicians do not document any discussion regarding the risks and benefits of taking opioids, other than including the boilerplate statement "side effect discussed."

74.    In fact, given the results of some of the Urinary Drug Testing, one would have to wonder if they were ever even looked at, reviewed or even noted, given the fact that illegal drugs like cocaine, heroin and others were found in the system following and during the prescribing of the opioids in question.

75.    For example, June 29, 2016 and March 2017, Patient RR. was seen at Mercyland and Orthopedic PC and was prescribed Hydrocodone-Acetaminophen.

76.     In these nine months, Defendants Reese James and Chitra Sinha both scribed the prescriptions for Patient RR approximately 8 times.

77.     Despite the various prescriptions being handed out, the drug testing yielded positive results on 6 different occasions for Oxy and Methadone, neither of which was in their medical history nor being prescribed by either physician.

78.     The medical records of this patient fail to note any discussion upon these findings nor any changes whatsoever to the treatment plan moving forward.

79.     Likewise, the same pattern exists with Patient SA who treated with Mercyland from December 12, 2016 through November 14, 2017.

80.     During that time, the patient received 10 prescriptions for Hydrocodone-Acetaminophen.

81.     On 8 different occasions the opioids were prescribed again without the drug showing in the patients system and despite the presence of heroin, OXY and cannabinoid all being detected.

82.     In fact, a script was provided immediately following the test result noted above regardless of the illegal substances found in the patient's system.

83.     Here again, no documentation of the findings and no alteration of the treatment plan is documented.

84.     These are but two examples of a repeated and continual pattern that exists following treatment and evaluation at Defendant Mercyland and Orthopedic, PC.

85.     As such, it can be said that these Defendants do not engage in any ongoing analysis of whether their patients should continue to receive opioids after a finding that the drug prescribed is not being used or finding illegal substances or non-prescribed narcotics in the test results.

86.     To the contrary, the vast majority of patients continue to receive renewals for opioids throughout their course of treatment at Defendants Orthopedic P.C. and Mercyland, a course that continues often for several months.

87.     As such, regardless of whether the opioids prescribed are helping the patient, the Physicians continue prescribing for no documented medical purpose whatsoever.

88.     Taken together, the prescription patterns of the Defendants, evidences the opioids and toxicology tests are not for medically necessary purposes.

89.     Instead, the prescription of these medications and these tests serve to further enrich the Defendants, and put the patient in harm's way.

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### COMMON LAW FRAUD

90.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1-89 above.

91.     Defendants intentionally and knowingly made or caused to be made false and fraudulent statements of material fact to Liberty Mutual by submitting, and causing to be submitted, thousands of bills and related documentation for services that were either not performed, or were not performed because they were medically necessary to address the unique needs of patients.

92.     The false statements of material fact include that:

(a)     the Physicians and Defendants legitimately examined and diagnosed patients, when, in fact, they did not;

(b)     the Physicians, Mercyland and Orthopedic PC, prescribed opioids, and UDT as well as performed other services including but not limited to P-Stim,  for patients that were medically necessary to address the unique needs of each patient, when, in fact, they did not;

(c)     Meds Direct filled prescriptions for opioids that were medically necessary and legitimate, when, in fact, they were not; and

(d)     Tox Testing submitted charges for medically necessary UDTs, when, in fact, they were not.

93.     Defendants knew that the above-described misrepresentations made to Liberty Mutual were false and fraudulent when they were made.

94.     Defendants made the above-described misrepresentations and engaged in such conduct to induce Liberty Mutual to rely on the misrepresentations.

95.     As a result of its justifiable reliance on these misrepresentations, Liberty Mutual has incurred damages of more than $1,500,000.00 in No-Fault Benefits paid to Defendants.

WHEREFORE, Liberty Mutual demands judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just and proper.

## SECOND CAUSE OF ACTION
## UNJUST ENRICHMENT

96.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1-95 above.

97.     Liberty Mutual conferred a benefit upon Defendants by paying their claims and Defendants voluntarily accepted and retained the benefit of those payments.

98.     Because Defendants knowingly submitted, and caused to be submitted, to Liberty Mutual bills and supporting documentation for services that were either not performed or were performed but not medically necessary, circumstances are

such that it would be unjust and inequitable to allow Defendants to retain the benefit of the monies paid.

99.     As a direct and proximate result of the above-described conduct, Liberty Mutual has been damaged and Defendants have been unjustly enriched.

WHEREFORE, Liberty Mutual demands judgment against Defendants for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just and proper.

## THIRD CAUSE OF ACTION
## DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201

100.   Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-99 above.

101.   This action is for declaratory relief pursuant to 28 U.S.C. § 2201.

102.   There is an actual case and controversy between Liberty Mutual, on one hand, and the various Defendants on the other hand, as to all charges for opioids ordered by the Physicians as well as additional services, that have not been paid.

103.   Liberty Mutual contends that the Defendants are not entitled to be paid for any of these unpaid claims and charges submitted to Liberty Mutual to date and through the trial of this case.

104.   There is an actual case and controversy between Liberty Mutual, on one hand, and the Defendants, on the other hand, as to all charges for alleged services ordered by the Physicians that have not been paid.

105.   Liberty Mutual contends that the Defendants are not entitled to be paid for any of these unpaid claims, by way of their fraud, deception and misrepresentations made during the submission of a claim for any charges submitted to Liberty Mutual to date and through the trial of this case.

106.   Because the various Defendants have knowingly made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim that each of them has submitted to Liberty Mutual, they are not entitled to any reimbursement for any unpaid claims and charges for services performed pursuant to the predetermined protocol submitted to Liberty Mutual to date and through the trial of this case.

WHEREFORE, Liberty Mutual respectfully requests a Judgment declaring that:

(a)   Defendants are not entitled to reimbursement for any unpaid claims and charges submitted to Liberty Mutual to date and through the trial of this case for any services provided.

107.   Liberty Mutual also respectfully seeks supplementary relief, attorneys' fees, interest, and costs, as this Court deems equitable, just, and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Liberty Mutual demands a trial by jury.

LAW OFFICES OF CHRISTINE GREIG

DATED:  7/10/19          BY: */s/ Michael C. O'Malley*

MICHAEL C. O'MALLEY, ESQUIRE
Attorney for Plaintiff, Liberty Mutual
Automobile Insurance Company
Michigan Bar ID #: _____

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 25, 2019, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following to all parties of record, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: None.

Respectfully submitted,

LAW OFFICES OF CHRISTINE GREIG

DATED:  7/10/19                    BY: /s/ *Michael C. O'Malley*

MICHAEL C. O'MALLEY, ESQUIRE
Attorney for Plaintiff, Liberty Mutual
Automobile Insurance Company
Michigan Bar ID #: _____